PER CURIAM.
J.D.A. (“the husband”) appeals from a judgment of the Montgomery Circuit Court that, among other things, divorced him from A.B.A. (“the wife”); divided the marital assets; awarded the wife periodic alimony; required the husband to pay child support for the parties’ two minor *606 children and postminority educational support for all three of the parties’ children; and awarded the wife an attorney fee. We affirm in part, reverse in part, and remand with instructions.
The parties married in 1987 when the wife, who was then 20 years old, was completing the requirements for an undergraduate degree in elementary education and the husband, who was then 24 years old, was employed as a certified public accountant (“CPA”) at BellSouth Corporation in Birmingham. The parties’ first child, a daughter (“the older daughter”), was born in November 1990. The husband worked at BellSouth until 1992, when he decided, with the wife’s support and encouragement, to reenroll in college in order to take the courses necessary to enable him to sit for the Medical College Acceptance Test and to attend medical school. In 1993, the husband entered medical school at the University of Alabama at Birmingham. The parties’ second child (“the younger daughter”) was born in 1994.
Following the completion of his first year of residency and the birth of the parties’ third child, a son, in 1998, the husband experienced an emotional breakdown. He left the hospital one day without explanation and arrived home distraught, telling the wife that he could not return to finish his residency. The wife scheduled an appointment for the husband with a psychiatrist and explained to the director of the husband’s medical program that the husband was not well and needed to rest. The husband was placed on medication, took a six-month break from his residency duties, and then completed his medical training. During the 10-year period that the husband pursued his medical education, the wife taught school in the Mountain Brook school system, earned a master’s degree in education, and began taking course work for a doctoral degree in education.
In 2003, the parties moved to Montgomery, where the husband was employed by a group of physicians practicing the specialty of radiology. His starting salary was $300,000. Two years later, he became a partner in the group and began earning a base salary of $400,000 plus dividends and bonuses. For the 5 years preceding the trial of the case in 2010, the husband’s adjusted gross income was $578,497 in 2005; $687,023 in 2006; $621,589 in 2007; $691,496 in 2008; and $685,915 in 2009. After the parties moved to Montgomery, the wife was not employed.
At trial, the wife testified that, throughout the marriage, the husband had been “busy tending to his career” and had avoided conflict, communication with her, and involvement with the children. Those problems, she said, had been aggravated by the husband’s excessive consumption of alcohol and, later, by his adulterous conduct. It was undisputed that, in 2004, the husband had had a brief affair with an employee of his radiology practice group, that he had confessed the affair to the wife, that the wife had forgiven him, and that the parties had thereafter participated in marital counseling. At trial, the husband admitted to a second affair that ultimately had caused the wife, in June 2009, to file a complaint seeking a divorce and to demand that the husband move out of the marital residence.
The husband characterized the parties’ marital problems as having stemmed from the wife’s excessive spending and excessive consumption of alcohol, her controlling personality, and her having intentionally involved the children in their marital conflicts. The husband testified that he had deposited his earnings in the parties’ joint checking account and that, when he had become concerned about the amount the *607 wife was spending and had indicated to her that he would reduce the money available in the joint account, the wife had threatened to “bounce checks” and to damage his credit rating if he did so.
The case was tried over four days, September 27, 28, and 29, and December 6, 2010. At the time of trial, the wife was 43 years old; the husband was 48 years old; and the parties’ children were 19, 16, and 12 years old, respectively. While the action was pending, the husband lived in the guest room of his sister’s house in Montgomery; the parties’ older daughter entered the University of Alabama and reached the age of majority; and the wife and the two minor children remained in the marital residence. Furthermore, during the pendency of the action, the husband deposited $16,000 to $20,000 per month in the parties’ joint checking account for the living expenses of the wife and the minor children and also paid the older daughter’s college expenses, the minor children’s private-school tuition, and all expenses associated with the family’s five vehicles.
The parties reached a partial settlement before trial, agreeing that they would sell the marital residence and that the wife would receive the net proceeds of that sale as part of her share of the marital assets. The wife used $200,000 of the $288,000 derived from the sale of the marital residence to make a down payment on a townhouse that she purchased for $375,000. The wife testified that she expected the monthly payment on her mortgage indebtedness for the townhouse to be approximately $1,500.
On January 13, 2011, the trial court entered a judgment divorcing the parties without making any factual findings and without specifying a ground for the divorce.[1] The trial court awarded the parties joint legal custody and the wife sole physical custody of the two minor children. The court determined that, if the parties were unable to reach a mutual decision on issues concerning the children, the husband would have the final decision-making authority on matters concerning the children’s education, health, automobiles, and sports activities and the wife would have the final decision-making authority on matters concerning religion and social/extracurricular activities. The trial court ordered the husband to pay the wife child support for the two minor children in the amount of $3,900 per month, to maintain the “529 Plan” accounts[2] for all three children, and to pay all three children’s *608 “college tuition and other costs pursuant to the requirements and limitations of Ex parte Bayliss [, 550 So.2d 986 (Ala.1989),] and its progeny.” The trial court further ordered the husband to pay “all costs associated with the automobiles [in the possession of the two daughters], including, but not limited to, maintenance, gasoline, and insurance.”
The trial court awarded the husband 57%, and the wife 43%, of the marital property for which the record indicates a value. In addition, the trial court awarded the wife periodic alimony in the amount of $10,000 per month and the sum of $40,000, which it designated as “a portion of the wife’s attorney’s fees, court costs, and litigation expenses.”[3]
Following the denial of his postjudgment motion, the husband appealed, raising the following issues for this court’s review: (I) whether the trial court failed to consider all relevant factors in making the property-division and periodic-alimony awards and whether those awards were inequitable; (II) whether the trial court erred in ordering him to pay postminority educational support for the parties’ three children; (III) whether the trial court erred in requiring him to pay for the daughters’ automobile expenses; and (IV) whether the trial court erred in awarding the wife an attorney fee.
I.
The husband argues that the trial court’s property-division and periodic-alimony awards were made without considering all relevant factors and were inequitable.
“On appeal the division of property and the award of alimony are interrelated, and the entire judgment must be considered in determining whether the trial court abused its discretion as to either issue. See O’Neal v. O’Neal, 678 So.2d 161 (Ala.Civ.App.1996). A property division does not have to be equal in order to be equitable based on the particular facts of each case; a determination of what is equitable rests within the sound discretion of the trial court. See Golden v. Golden, 681 So.2d 605 (Ala.Civ.App. 1996).
“When dividing marital property and determining a party’s need for alimony, a trial court should consider several factors, including ‘ “the length of the marriage, the age and health of the parties, the future employment prospects of the parties, the source, value, and type of property owned, and the standard of living to which the parties have become accustomed during the marriage.” ’ Ex parte Elliott, 782 So.2d 308 (Ala.2000) (quoting Nowell v. Nowell, 474 So.2d 1128, 1129 (Ala.Civ.App.1985)) (footnote omitted). In addition, the trial court may also consider the conduct of the parties with regard to the breakdown of the marriage, even where the parties are divorced on the basis of incompatibility, or where, as here, the trial court failed *609 to specify the grounds upon which it based its divorce judgment. Ex parte Drummond, 785 So.2d. 358 (Ala.2000); Myrick v. Myrick, 714 So.2d 311 (Ala. Civ.App.1998). It is well-settled that where a trial court does not make specific factual findings, the appellate court must assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. Ex parte Fann, 810 So.2d 631 (Ala.2001); Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996).”
Baggett v. Baggett, 855 So.2d 556, 559-60 (Ala.Civ.App.2003).
The parties acquired substantial assets during their marriage. The wife was awarded the unencumbered automobile in her possession and the husband was awarded the unencumbered automobile and pickup truck in his possession. Each party was awarded the furniture, furnishings, fixtures, appliances, and personal effects in his or her possession. The record does not indicate the value of the foregoing personal property, but the evidence indicated that the wife retained most of the contents of the 5-bedroom, 4,200-square-foot marital residence that had been furnished with antiques purchased after the parties moved to Montgomery. The trial court divided the remainder of the marital assets as follows:
Awarded to Awarded to _Assets_Value_Husband_Wife ,
Vacant lot, Lockwood Subd._90,000_90,000_0_
Net proceeds from sale of marital 288,000 0 288,000
residence_
Husband’s Roth IRA_129,000_64,500_64,500
Joint Fidelity savings account_90,000_45,000_45,000
Husband’s Fidelity profit-sharing ' 292,770 292,770 0 account_
Wife’s Roth IRA_16,000_8,000_8,000
Wife’s Traditional IRA_33,000_16,500_16,500
Regions Bank checking account_251,000_125,500_125,500
ServisFirst stock_20,000_10,000_10,000
Morgan-Keegan stock_1,343_1,343_0_
Regions Bank stock_2,297_2,297_0_
Wife’s teacher retirement acc’t_23,000_0_23,000
Husband’s equity interest in medical 120,000 120,000 0 •practice_
Total_$1,356,410 $775,910 (57%) $580,500 (43%)
The husband contends that the trial court’s property-division and periodic-alimony awards reflect a consideration of only the first and last factors listed in Baggett, supra — i.e., the length of the marriage (23 years) and the parties’ standard of living (affluent) — thereby ignoring, the husband says, the remaining factors: that the wife is relatively young and in good health; that, with a master’s degree in education and 10 years’ teaching experience, the wife’s future employment prospects are good; and that the husband’s income is the source of virtually all the marital property. The husband requested that the trial court determine that the wife had the ability to earn an annual income of $45,000, consistent with the salary she had last earned as a teacher, and award her rehabilitative alimony in the initial amount *610 of $6,300 per month, with that amount gradually declining over a 6-year period and ending when the son leaves home for college.
The wife testified that she had no plans to return to the workforce; she requested that the trial court award her half the marital property and periodic alimony in the amount of $12,000 per month, which amount, she said, would allow her to maintain the standard of living the parties had enjoyed during the marriage. The wife presented a compilation of the family’s spending history for the 26 months preceding trial. The wife’s expert witness, a CPA, determined that the family’s monthly expenditures had averaged $16,599; he reduced that amount by 20% to account for the fact that the wife’s postdivorce household would have 4 members instead of 5; and he concluded that periodic alimony in the amount of at least $11,731 per month would provide the wife with a postdivorce standard of living that was commensurate with the family’s predivorce status.
On cross-examination, the wife’s expert witness readily acknowledged that the wife’s compilation was not a “budget.” Rather, he said, it was a record of what the family had actually spent for the previous 26 months, divided by 26 and represented as “monthly expenses” in order to illustrate the standard of living that the wife had enjoyed during the marriage. The wife’s monthly expenses included, among other things, $2,000 for savings, $1,280 for vacations, $860 for groceries, $630 for restaurants, $550 for gifts, and $420 for home repair and maintenance. On cross-examination of the wife’s expert, the husband challenged the legitimacy of many, if not most, of the line items in the wife’s compilation. For example, he questioned why the wife needed $420 per month to repair and maintain a 2,700-square-foot townhouse that was only 17 years old. The wife’s expert explained that the $420 figure labeled “repair and maintenance” had actually been derived from the more than $100,000 in expenditures the family had made to renovate the 85-year-old marital residence — expenditures that, the accountant conceded, should properly have been classified as “capital improvements” and that could not validly have been used to determine a repair-and-maintenance expense for the wife’s new townhouse. The wife’s expert made similar concessions with respect to the wife’s need to save $2,000 per month in light of the substantial liquid assets that she was requesting in a division of the marital property; the accuracy of the wife’s monthly utility expenses, which reflected the total utility bills for the marital residence over the past 26 months divided by 26; the reason for a veterinary expense of $100 per month when, the wife acknowledged, she did not want, and was not taking, the family’s pets; the validity of a $300 line item for the husband’s life-insurance premiums, which expense, the wife admitted, the husband would pay after the divorce; and the need for “yard-care” and “household help” expenses totaling $500 per month when the wife’s townhouse is substantially smaller than the marital residence and has a tiny yard. In addition, the wife’s expert conceded that the line items for restaurants and groceries were “high,” but, he repeated, he had simply taken the family’s spending history and converted it to a monthly expense format in order to illustrate the wife’s “standard of living,” rather than her “need.” He acknowledged that the word “need” implies “budgetary restraint,” a concept that, the expert said, the wife’s compilation had not been intended to represent.
Much of the evidence at trial focused upon how to assess the husband’s income for purposes of determining his ability to pay periodic alimony. The wife took the *611 position that the husband’s annual gross income was composed of his base salary of $400,000, plus bonuses averaging $250,000 over the 5 years preceding the trial, plus the radiology practice group’s $48,000 annual contribution to the husband’s retirement plan. By her calculations, the husband’s net monthly income, based on his earnings in 2009, the most recent year for which full information was available, and after accounting for the monthly alimony she was requesting, would be $27,288.[4] The husband took the position that his base salary of $400,000 (or other “wages”) should be considered his income for purposes of determining his ability to pay periodic alimony because, he said, his bonuses were inconsistent and speculative. He did not address whether the radiology practice group’s contributions to his retirement plan were income. By his calculations, his net monthly income, before accounting for the monthly alimony the wife was requesting, was $22,750.
The business manager of the husband’s radiology practice group testified that bonuses are paid two, or sometimes three, times a year, not monthly. In 2010, the husband had already received one bonus of $25,645, and, according to the business manager, the husband could expect another bonus of approximately $40,000 before the end of the year, thereby making his 2010 income $465,645.[5] The business manager explained that the partners in the husband’s radiology practice group had determined not to distribute to themselves, in future years, as much of the group’s retained earnings as they had done in past years. That determination, the business manager said, was a consequence of a 33% reduction in the group’s earnings since August 2009, a reduction that, according to the business manager, could be attributed to the uncertainty that attended healthcare reform, lower Medicare reimbursements to physicians, loss of contracts, and the group’s intention to comply with the loan covenants relating to an imaging center in which the group had a 33% interest.
The husband’s expert witness, a CPA and financial planner, testified that the amount of the husband’s bonuses had fluctuated by 40% over the 5 years preceding the trial, and, moreover, he said, the bonuses had not been on a steady upward trajectory, and, in both 2007 and 2009, had actually been reduced from the previous years. Further, the husband’s expert opined, future bonus income is speculative and should not form the basis for a periodic-alimony award that is based upon a pay- or’s current earnings. Using what he referred to as a “Monte Carlo simulation”— an analytical formula that financial planners use to determine if a client will “outlive his money” — the husband’s expert wit *612 ness stated that the husband could pay the amount of alimony, child support, and other financial obligations that the wife had requested he be ordered to pay if the husband “peeled off’ 4, 5, or 6% of his assets every year, but, he said, the husband would also have to work until the age of 94 or 95.
With respect to the husband’s argument that the trial court, in making the property-division and periodic-alimony awards, failed to consider all the factors outlined in Baggett, supra, we note that the trial court made no specific findings of fact; however, unless the record demonstrates otherwise, we presume that the trial court considered all the applicable factors and simply chose to weigh some factors more heavily than others. Cf. Ramsey v. Ramsey, 995 So.2d 881, 887 (Ala.Civ.App.2008) (“trial court’s indication that it considered one of many factors enumerated in a statute” does not “require! ] an appellate court to presume that the trial court did not also consider the other factors enumerated in that same statute”). The husband contends that all but the first and last Baggett factors, which we discuss below, weigh in favor of awarding the wife only short-term rehabilitative alimony.
The age and health of the parties. Both parties are relatively young and in good health. The husband suffers from hypertension, hyperlipidemia, and depression, and he takes prescription medications to control those conditions.
The future employment prospects of the parties. The wife has a master’s degree in education and 10 years’ experience teaching in an excellent school system. The evidence was undisputed that the wife had not been employed outside the home for seven years, however, and that her teacher’s certificate had lapsed. The wife stated that, in order to be recertified, she would have to complete additional course work that could take as long as one year. The husband presented no evidence to the contrary. “This court has held that the ‘ability to earn, as opposed to actual earnings, is a proper factor to consider’ in deciding an award of periodic alimony.” Miller v. Miller, 47 So.3d 262, 265 (Ala. Civ.App.2009) (quoting Ebert v. Ebert, 469 So.2d 615, 618 (Aa.Civ.App.1985)). See also Stone v. Stone, 26 So.3d 1232, 1236 (Ala.Civ.App.2009) (“In fashioning a property division and an award of alimony, the trial court must consider factors such as the earning capacities of the parties.... ” (emphasis added)).
The source, value, and type of property owned. The husband’s substantial earnings were the source of 94% of the marital property and were the source of all property acquired after the parties moved to Montgomery in 2003. However, the 7-year period between 2003 and 2010, when this case was tried, represents less than 1/3 of the parties’ 23-year marriage, and, in prior years, the wife’s earnings had supported the family while the husband was in medical school. “[A] trial court may ... consider the spouses’ relative economic and noneconomic contributions to the marriage in dividing the marital property and awarding periodic alimony.” E.A.B. v. D.G.W., 127 So.3d 422, 432 (Ala. Civ.App.2012) (citing Weeks v. Weeks, 27 So.3d 526, 532-33 (Ala.Civ.App.2008)). The trial court reasonably could have found that the wife had made significant economic and noneconomic contributions to the marriage by supporting the husband’s desire to change careers and by shepherding him through an emotional breakdown in 1998 — assistance and support without which the husband might not have achieved the education and training that enabled him to earn the income the parties had enjoyed in the latter years of their marriage.
*613 The conduct of the parties with regard to the breakdown of the marriage. The trial court made no finding of fault and did not state a ground for the divorce. It stated during the trial that “nobody is one hundred percent at fault in any divorce. It is just the balance of it. I mean that’s for me to weigh.” (Emphasis added.) Based on the evidence presented, the trial court reasonably could have determined that, although both parties shared fault for the problems in the relationship, it was the husband’s second adulterous affair that ultimately had caused the breakdown of the marriage.
We cannot conclude that the trial court failed to consider all the applicable factors just because the trial court declined the husband’s invitation to award the wife short-term rehabilitative alimony. The fact that appellate-court judges may have weighed the factors differently than did the trial court “does not constitute a basis for ... reversal of the trial court which heard the evidence and observed the witnesses.” Grimsley v. Grimsley, 545 So.2d 75, 77 (Ala.Civ.App.1989). That said, we conclude that the amount of periodic alimony awarded to the wife was inequitable.
“ ‘ “The trial court has wide discretion over alimony and the division of property, and it may use whatever means are reasonable and necessary to equitably divide the parties’ property. Its judgment is presumed correct and will not be reversed unless it is so unsupported by the evidence ... as to be unjust and palpably wrong. However, that judgment is subject to review and revision.” ’ ”
Ex parte Foley, 864 So.2d 1094, 1097 (Ala. 2003) (quoting Ex parte Drummond, 785 So.2d 358, 361 (Ala.2000), quoting in turn Bushnell v. Bushnell, 713 So.2d 962, 964-65 (Ala.Civ.App.1997)) (internal citations omitted).
First, as the wife’s own expert witness acknowledged, many of the line items on the wife’s “standard-of-living compilation” bore little or no relationship to her needs, or to the situation that will exist when she and the two minor children live in a new residence and the children also spend substantial time with the husband, who was awarded liberal visitation.
“[T]he purpose of periodic alimony is to support the former dependent spouse and to enable that spouse, to the extent possible, to maintain the status that the parties had enjoyed during the marriage, until the spouse is self-supporting or maintaining a lifestyle or status similar to the one enjoyed during the marriage.”
O’Neal v. O’Neal, 678 So.2d 161, 165 (Ala. Civ.App.1996) (emphasis added). In Gates v. Gates, 830 So.2d 746, 750 (Ala.Civ.App. 2002), this court explained that “[t]he phrase from O’Neal, ... ‘to the extent possible’ recognizes that both former spouses will have to live on substantially less income” after a divorce. Neither party can maintain the same standard of living that resulted from one income when that income must support two households. The trial court appeared to recognize that reality when it stated during the trial:
“[W]ith two households things are going to be different, right? They are going to be a little different — if it was perfect y’all wouldn’t get divorced. But since you are going to have to get divorced [your] lifestyle should reflect [your] old one but not be exactly like [your] old one. It is just not possible.”
Nevertheless, despite the fact that the wife’s “monthly expense” compilation appeared to be based more on her wants than her needs, the trial court granted the wife nearly all that she requested. The *614 court awarded her monthly periodic alimony in an amount only slightly less than the $11,731 her expert witness suggested and, considering that the wife kept most of the furnishings in the marital residence, property for which the record indicated no value but which, if valued, would likely make the wife’s share more than the 43% indicated in the table, supra. The husband testified that the wife had spent $12,000 on antique furniture for the dining room alone.
Second, the wife’s assessment of the husband’s net monthly income included elements that, either as a matter of law or within the trial court’s discretion, should not have been considered in determining the husband’s net monthly income for the purpose of fashioning an alimony award. According to the wife, the husband’s net monthly income, after accounting for the monthly alimony she requested, is $27,288; according to the husband, his net monthly income, before accounting for the monthly alimony the wife requested, is $22,750. The wife’s assessment is incorrect because it is based, in part, upon the radiology practice group’s contributions to the husband’s retirement plan. Employer contributions to retirement plans are not generally considered “income” to the recipient, even for purposes of child-support determinations, which are governed by an expansive definition of “gross income.” See In re Marriage of Mugge, 66 P.3d 207, 211 (Colo.Ct.App.2003) (“Most jurisdictions addressing the question have held that undistributed employer contributions to pension and retirement plans do not constitute income for purposes of calculating child support.”). That result is logical because “there [is] no discernible way in which [such] contributions would be of any assistance to [a parent] in satisfying” a child-support obligation. Farr v. Cloninger, 937 S.W.2d 760, 764 (Mo.Ct.App.1997). The same is true with respect to spousal support.
Moreover, the trial court had the discretion, but was not required, to consider the husband’s bonuses as part of his income. “Rule 32[ (B)(2)(a), Ala. R. Jud. Admin.,] requires that, in determining child-support obligations, bonuses and expense reimbursements be included in gross income.” Stinson v. Stinson, 729 So.2d 864, 866 (Ala.Civ.App.1998). See also Arnold v. Arnold, 977 So.2d 501 (Ala. Civ.App.2007). However, we have found only one Alabama case, Reaves v. Reaves, 883 So.2d 693 (Ala.Civ.App.2003), that included a payor’s bonus in income for the purpose of determining a periodic-alimony obligation, and that case did not hold that such inclusion was required. Instead, citing the Rule 32 inclusion of bonuses in the definition of “gross income,” the Reaves court determined that the trial court had not acted outside the limits of its discretion in including the husband’s bonus in his income. 883 So.2d at 699. We interpret Reaves to mean that, whether to include bonuses in a spouse’s income for purposes of determining periodic alimony is discretionary with the trial court. The exercise of that discretion will naturally depend upon a number of factors, including whether the bonuses are regular and consistent, and, therefore, can provide both the payor spouse and the recipient spouse with certainty in financial planning.
As the husband’s financial-planning expert implied, the wife’s estimation of the amount of periodic alimony that was required to guarantee her the same standard of living that she had enjoyed during the marriage ignored “the impact [that] an award of periodic alimony [would] have on the financial condition of the [husband] and his ... ability to maintain the parties’ former marital lifestyle for himself.” Shewbart v. Shewbart, 64 So.3d 1080, 1088 *615 (Ala.Civ.App.2010) (citing O’Neal v. O’Neal, 678 So.2d at 164) (emphasis added). “In considering the [husband’s] ability to pay [periodic alimony], the trial court should take into account all the financial obligations of the [husband], including those obligations created by the divorce judgment.” Id.
Using the husband’s assessment that his monthly net income is $22,750, it appears that the husband will not be able to meet the obligations imposed upon him by the divorce judgment and pay his own monthly living expenses without drawing down assets. In addition to the $10,000-per-month alimony obligation and the $3,900 child-support obligation, the divorce judgment requires the husband to fund the three children’s “529” plan accounts. The husband deposits a total of $2,500 per month in those accounts ($500 for the older daughter and $1,000 each for the younger daughter and the son). In addition, the husband pays $1,914 per month for the minor children’s private-school tuition.[6] The monthly alimony, child-support, 529-plan, and private-school-tuition expenses total $18,314, leaving only $4,436 for all the husband’s personal and household expenses. During the pendency of this action, the husband had been living in his sister’s house, but, in order to maintain his standard of living he will have to purchase a residence, make payments on a mortgage indebtedness, and shoulder the other financial burdens incident to home ownership.
Because the wife’s “standard-of-living compilation” was wholly unreliable in determining her reasonable and necessary living expenses, and because the trial court implicitly relied on that compilation and on the wife’s erroneous estimation of the husband’s net monthly income, we reverse the periodic-alimony award and remand the cause to the circuit court to reconsider the alimony award. Because property-division and periodic-alimony awards are interrelated, we must also reverse the trial court’s division of marital assets for the circuit court to reconsider the periodic-alimony and property-division awards together.
II.
The husband next contends that the trial court erred in ordering him to pay postminority educational support for the parties’ three children. The wife maintains that the husband waived that argument by stipulating at trial that he would pay the children’s college expenses. We disagree that there was such a stipulation.
On two occasions during the trial, the husband was asked whether he was willing to pay the children’s college expenses. On the first occasion, the husband replied that he “wanted the children to have college educations,” and that their college educations “need[ed] to be paid for by somebody,” but that he “didn’t know how much [the wife] want[ed] to contribute.” On the second occasion, the husband stated that he did not wish to be “locked into [being] 100% responsible” for the children’s college expenses. Later in the trial, the husband presented a budget that was based on the assumptions that his gross income was $400,000, that bonus income was not counted for purposes of the property-division and periodic-alimony awards, and that the wife would be awarded rehabilitative alimony for six years. In that budget, the husband listed college, private-school-tuition, and automobile expenses for the children. The husband presented evidence indicating that, if he paid his own living *616 expenses, the children’s automobile expenses and private school tuition, and post-minority educational support, he would have only $564 left to pay periodic alimony. The following then occurred:
“THE COURT: Is there anything that y’all can agree on that you can settle any aspect of this thing? I mean college expense, child support? ....
[[Image here]]
“[Wife’s counsel]: You know, if he is committing to pay and be legally bound to pay college education expenses that’s one thing. But putting these numbers in his budget ... saying he is paying that for the children and actually paying on [a] legal basis is different.
[[Image here]]
“THE COURT: I think he is setting out what it is costing him to me. Stipulating that he is going to pay that.
“[Husband’s counsel]: Wait.
“THE COURT: And I am going to order him to pay that.
“[Husband’s counsel]: But what he is willing to do in accepting an order for that and that’s pretty big to accept an order, is to say I want to have final decision-making authority over [matters concerning the children’s education]. Otherwise he is relegated to being the check writer while he is being thrown under the bus.”
Taken in light of the entire record, and considered in the context of the purpose for which the husband’s budget was submitted (to illustrate the husband’s ability to pay either all the children’s expenses or periodic alimony in the amount requested by the wife, but not both), we do not believe that the husband’s inclusion of postminority educational expenses in his budget constituted a stipulation by the husband that he would pay those expenses.
In Ex parte Bayliss, 550 So.2d 986 (Ala. 1989), our supreme court held that the trial court has discretion whether to order postminority support and that, in exercising that discretion, the trial court shall consider
“all relevant factors that shall appear reasonable and necessary, including primarily the financial resources of the parents and the child and the child’s commitment to, and aptitude for, the requested education.”
550 So.2d at 987. In addition, the trial court may consider
“the standard of living that the child would have enjoyed if the marriage had not been dissolved and the family unit had been preserved and the child’s relationship with his parents and responsiveness to parental advice and guidance.”

Id.-

At the time of trial, the older daughter was already attending the University of Alabama. She had received a scholarship from the university for half her tuition and an Alabama Power Company scholarship for her freshman year in the amount of $5,000. It was undisputed that the husband had been paying the remainder of the older daughter’s expenses, including $500 per month for costs associated with her sorority membership and $1,000 per month for “incidentals,” including the expenses associated with her automobile. Because the evidence presented at trial satisfied the prerequisites, as outlined in Bayliss, supra, for a postminority-educational-support order with respect to the older daughter, the trial court’s judgment is affirmed insofar as it related to postminority educational support for her.
The same cannot be said, however, with respect to that part of the trial court’s judgment that ordered the husband *617 to pay postminority educational support for the younger daughter and the son, who were, at the time of trial, 16 and 12 years old, respectively. Other than testimony indicating that the younger daughter was a “good student” who had a “strained” relationship with the husband and that the son was having some academic difficulties, there was no evidence concerning the prerequisites for a Bayliss order. Indeed, if such evidence had been presented, it would have been premature and improper to have ordered the husband to be responsible for paying postminority educational support for the two minor children “‘before [those children] ha[d] reached or nearly reached graduation from high school and before all of the relevant factors ha[d] been presented and considered by the court.’ ” Berryhill v. Reeves, 705 So.2d 505, 508 (Ala.Civ.App.1997) (quoting Mansmann v. State ex rel. Eiland, 590 So.2d 308, 309 (Ala.Civ.App.1991)). See also Wells v. McNeal, 646 So.2d 59, 61 (Ala.Civ.App.1994) (holding it improper to have determined a parent’s obligation for postminority educational support of a 14-year-old child because “the appropriate factors [could not] be reasonably ascertained” at that time).
We reverse that part of the trial court’s judgment pertaining to postminority educational support for the two minor children. The trial court “retains jurisdiction to receive all relevant evidence concerning [postminority educational support for the two minor children] at an appropriate time.” Berryhill, 705 So.2d at 508.
III.
The husband argues that the trial court erred in requiring him to pay for the daughters’ automobile expenses. We agree.
A. The older daughter’s automobile expenses.
Paragraph 6 of the trial court’s judgment, which requires the husband to pay “college tuition and other costs pursuant to ... Ex parte Bayliss,” states, in pertinent part:
“[E]xpenditures for extras such as sororities and fraternities, automobiles, trips, and non-essential expenses are optional and shall be provided at the discretion of the parties as they deem appropriate and in their children’s best interests.”
Paragraph 12(c) of the trial court’s judgment states:
“[The daughters] currently have [the] use and possession of automobiles. Ownership of these automobiles shall remain as currently titled. However, both children shall continue to have the use and possession of their respective automobiles. Neither of these automobiles are encumbered by debt. The husband shall be responsible for paying all costs associated with these automobiles including, but not limited to, maintenance, gasoline, and insurance.”
In resolving the conflict between paragraph 6 (stating that “automobiles ... and non-essential expenses [related to postmi-nority educational support] are optional and shall be provided at the discretion of the parties as they deem appropriate and in their children’s best interests”) and paragraph 12(c) (requiring the husband to pay “all costs associated with [both daughters’] automobiles”), we are governed by the following principles in construing the judgment:
“[D]ivorce judgments should ‘be interpreted or construed like other written instruments.’ Sarbin v. Sartin, 678 So.2d 1181, 1183 (Ala.Civ.App.1996); see also Springer v. Damrich, 993 So.2d 481, 488 (Ala.Civ.App.2008)....
*618 “When interpreting possibly conflicting provisions in a judgment, specific terms are given more weight than are more general provisions. See Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 36 (Ala.1998).”
Cockrell v. Cockrell, 40 So.3d 712, 715 (Ala. Civ.App.2009). Paragraph 12(c) concerns the payment of automobile expenses for both adult and minor children. Paragraph 6, on the other hand, concerns the payment of automobile expenses only for an adult child in college. We conclude that paragraph 6 is the more specific, and, therefore, the controlling, provision. Accordingly, because the husband’s payment of the older daughter’s automobile expenses is optional and may be provided at the discretion of the husband, we reverse the trial court’s judgment insofar as, in paragraph 12(c), it requires the payment of expenses associated with the older daughter’s automobile.
B. The younger daughter’s automobile expenses.
The wife argues that, because the husband’s adjusted gross income exceeds the uppermost levels of the child-support guidelines, Rule 32(C)(1), Ala. R. Jud. Admin., authorized the trial court to order the husband to pay the expenses of the younger daughter’s automobile. The wife is correct, but in ordering the husband to pay those expenses, the trial court was required to comply with Rule 32(C)(4), Ala. R. Jud. Admin., which provides:
“(4) Additional Awards for Child Support. In addition to the recommended child support order, the court may make additional awards for extraordinary medical, dental, and educational expenses if (i) the parties have in writing agreed to such awards or (ii) the cowt, upon reviewing the evidence, determines that [such] awards are in the best interest of the children and states its reasons for making [such] additional awards.”
(Emphasis added.) See A.B. v. J.B., 40 So.3d 723, 733 (Ala.Civ.App.2009) (reversing a judgment insofar as it required a parent to pay half of child’s expenses for extracurricular activities because, among other reasons, “[t]he final judgment ... failed to include the language necessary to support an award under Rule 32(C)(4)”).
In McGowin v. McGowin, 991 So.2d 735 (Ala.Civ.App.2008) (plurality opinion), the parties’ combined adjusted gross income exceeded the uppermost limit of the child-support schedule by a factor of four, but the trial court ordered the father to pay child support only in the amount specified for two children when the parties’ combined income is $10,000 per month. The father argued that the trial court’s child-support award was not insufficient because he had also been ordered to pay the children’s private-school tuition. This court rejected that argument, noting that the father’s tuition obligation “would be considered an ‘additional’ award of child support under Rule 32(C)(4), Ala. R. Jud. Admin.,” 991 So.2d at 742, thus indicating this court’s implicit recognition that Rule 32(C)(4) applies even in the case of high-income parents whose basic child-support obligation is not determined by reference to the guidelines.
In the present case, the parties did not agree to the award of automobile expenses, and the trial court did not state its reasons for making the award. Accordingly, we reverse the trial court’s judgment insofar as it relates to the payment of expenses associated with the younger daughter’s automobile. If the trial court determines, on remand, to order the husband to pay the younger daughter’s automobile expenses, the trial court should *619 state it reasons for the award, considering that,
“[w]hen the combined adjusted gross income exceeds the uppermost limit of the child support schedule, the amount of child support awarded must rationally relate to the reasonable and necessary needs of the child, taking into account the lifestyle to which the child was accustomed and the standard of living the child enjoyed before the divorce, and must reasonably relate to the obligor’s ability to pay for those needs.”
Dyas v. Dyas, 683 So.2d 971, 973-74 (Ala. Civ.App.1995) (some emphasis added; footnote omitted).
IV.
Paragraph 19(a) of the trial court’s judgment states, in pertinent part: “The husband is ordered to pay the wife the sum of $40,000, which is a portion of the wife’s attorney fees, court costs, and litigation expenses.” The record indicates that the wife paid a portion of her attorney fee before the case came to trial. The parties’ partial settlement agreement, executed on September 21, 2010, states, in pertinent part: “By her signature below the wife acknowledges that she incurred the second mortgage [on the marital residence] in the amount of $45,000 of her own volition to pay her own attorney fees.”
During the trial of the case, the wife requested an attorney fee and the wife’s counsel stated that he would submit an attorney-fee affidavit at the end of the trial. Then, at a hearing on the husband’s postjudgment motion,[7] the wife’s counsel stated that the wife had incurred $74,000 in attorney fees “through the trial” and that he had submitted an attorney-fee affidavit to the trial court. The record on appeal, however, does not contain an attorney-fee affidavit of the wife’s counsel.
We pretermit further discussion of the attorney-fee award because, as we observed in Frazier v. Curry, 104 So.3d 220, 228 (Ala.Civ.App.2012),
“the financial circumstances of the parties as well as the results of the litigation are undetermined because we have reversed the trial court’s property division and alimony award in their entirety and remanded the case for further consideration. Accordingly, we reverse the attorney-fee award and direct the trial court to further consider the issue on remand.”

Conclusion

We reverse the trial court’s judgment insofar as it ordered the husband to pay the postminority educational expenses of the two minor children; required the husband to pay the expenses associated with the daughters’ automobiles; awarded the wife $10,000 per month in periodic alimony; and awarded the wife an attorney fee. Because the division of marital assets is considered in conjunction with an award of periodic alimony, we also reverse the trial court’s property-division awards so that the circuit court may reconsider the alimony and marital-property awards together. In its consideration of the property-division, periodic-alimony, and attorney-fee awards on remand, the circuit court is not authorized to conduct an evidentiary hearing. Rather, that court is limited to entering a judgment on the evidence in the record before it. See Courtright v. Courtright, 820 So.2d 823, 823 (Ala.Civ.App. 2001) (“Because the trial court considered new evidence in fashioning its ... judg *620 ment on remand, we must reverse. The case is remanded for the trial court to fashion an equitable property division and alimony award based upon the evidence that was before the [trial] couH at the time of [the] original divorce judgment.” (emphasis added)).
In all other respects, the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, THOMAS, and DONALDSON, JJ., concur.
MOORE, J., concurs in part, concurs in the result in part, and dissents in part, with writing, which THOMPSON, P.J., joins.

. Neither party argues that the trial court erred in failing to specify a ground for the divorce.
"Although it is the better practice to set out the grounds in its decree, a trial court will not be reversed for its failure to do so. Cozad v. Cozad, 372 So.2d 1322 (Ala.Civ. App.1979). Where the decree fails to contain grounds for the divorce, this court will examine the record to see if there is sufficient evidence to support the ground or grounds propounded by the parties and if so the decree will be affirmed. Cozad, supra."
Mathieson v. Mathieson, 409 So.2d 439, 442 (Ala.Civ.App.1982). In the present case, the wife sought a divorce on the ground of incompatibility and the husband’s answer to the wife’s complaint acknowledged that the parties were incompatible. The evidence supported incompatibility as a ground for the divorce.

. Congress created a tax exemption found in 26 U.S.C. § 529 in order to encourage taxpayers to save for future college expenses. See S.Rep. No. 104-281, 106, Pub.L. No. 104-188, 1996 U.S.C.C.A.N. 1474, 1580 (stating that the reason for the change in the law was to "clarify the tax treatment of State-sponsored prepaid tuition programs and educational savings programs in order to encourage persons to save to meet post-secondaiy educational expenses”).

. When the trial recessed on September 29, the trial court ordered the husband to continue to deposit $16,000 per month in the parties’ joint checking account for the wife's living expenses. When the trial resumed on December 6, the wife filed a petition seeking a finding that the husband was in contempt of the trial court’s September 29 order. The trial judge stated that he had read the wife's petition and the husband's response and that he would "probably ... just wait until the end to see what to do about that.” The record contains no express or implied ruling on the wife's contempt petition.
On February 4, 2013, this court remanded the cause to the circuit court for 14 days for it to adjudicate the outstanding contempt claim or to enter a certification of the judgment pursuant to Rule 54(b), Ala. R. Civ. P. On February 11, 2013, the circuit court entered an order dismissing the wife's contempt claim.

. The wife’s expert concluded that the husband’s income for 2009 was $731,222 — a figure that he arrived at by adding the husband’s wages of $462,222 (base salary of $400,000 plus $62,222 earned by substituting for other physicians in the group), bonuses of $221,000, and the radiology practice group’s contribution to the husband's retirement plan in the amount of 48,000. The expert explained that the retirement-plan contribution was nontaxable income, that the proposed annual alimony payment of approximately $140,000 would be tax deductible, and that the husband’s adjusted gross income would, therefore, be $542,448, on which the husband would pay approximately $200,000 in federal and state taxes, resulting, the expert said, in net annual income to the husband of $327,458, or $27,288 in net monthly income.

. When the trial resumed on December 6, 2010, the husband acknowledged that he had received a bonus in the amount of $50,000 in November 2010 and that an additional bonus in the amount of $40,000 was still projected for December 2010. If that projection proved to be accurate, then the husband's 2010 income, according to the business manager's methodology, would have been $515,645.

. The divorce judgment does not order the husband to pay the tuition. The husband, 'however, stated at trial that he would do so, and neither party raises the issue on appeal.

. The hearing was not conducted by the circuit judge who had presided over the trial of this case. That judge was defeated in the 2010 election, and the circuit judge who replaced him conducted the hearing.